## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALAN R. TROMINSKI, THE REGENTS
OF THE UNIVERSITY OF MICHIGAN,
a Michigan constitutional corporation, on
behalf of its health system, and HURON
VALEEY-SINAI HOSPITAL, a Michigan
non-profit corporation,

        Plaintiffs,

                                                  CASE NO. 02-73176

v.                                           HON. LAWRENCE P. ZATKOFF

BUSINESS INTERLINK SERVICES, INC.,
a Michigan corporation, VINCENT I. MANZO,
and BUSINESS INTERLINK SERVICES, INC.
EMPLOYEE HEALTH BENEFIT PLAN,
Jointly and Severally,

        Defendants.

_____/

### OPINION AND ORDER

AT A SESSION of said Court, held in the Theodore Levin United States Courthouse,
in the City of Port Huron, State of Michigan, on June 24, 2005

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on cross motions for judgment on the administrative record.

Defendants responded to Plaintiffs' motion, but Plaintiffs did not respond to Defendants' motion.

The Court finds that the parties have adequately set forth the relevant law and facts, and that oral

argument would not aid in the disposition of the instant motions.  *See* E.D. MICH. L.R. 7.1(e)(2).

Accordingly, the Court ORDERS that the motions be decided on the briefs submitted.  For the reasons set forth below, Plaintiffs' Motion to Overturn Administrative Decision will be GRANTED IN PART.  Defendants' Motion for Judgment on the Administrative Record will also be GRANTED IN PART.

## II.  BACKGROUND

This is an action for medical benefits under an employee fringe benefits plan subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs in this matter are Alan Trominski, (hereinafter "Plaintiff" or "Plaintiff Trominski"), the Regents of the University of Michigan (hereinafter "U of M"), and Huron Valley-Sinai Hospital (hereinafter "HVSH").  Defendants are Business Interlink Services, Inc. (hereinafter "BIS"), Vincent Manzo, and the Business Interlink Services, Inc., Employee Health Benefit Plan (hereinafter "Plan").  The facts of this case were previously set forth in this Court's December 5, 2003, Opinion and Order in which the Court denied Defendant BIS's motion for judgment on the administrative record without prejudice, granted in part Plaintiff's motion for judgment on the administrative record, and remanded this matter to the plan administrator.  Nevertheless, the Court will briefly set forth the relevant facts in this matter.

### A.  Facts

Plaintiff Trominski is a former employee of Defendant BIS.  Defendant BIS is an employee leasing company that specializes in providing truck drivers to the trucking industry.  It is undisputed that Defendant BIS's trucking customers interview and select potential employees, who are then approved and hired by Defendant BIS.  A trucking company called T&L Transport, one of

2

Defendant BIS's customers, interviewed Plaintiff Trominski and recommended him to Defendant BIS for approval. Defendant BIS approved Plaintiff Trominski's application and he became an employee of Defendant BIS in January 2000. For the entire period of Plaintiff's employment, Defendant BIS leased Plaintiff Trominski to T&L Transport to work as a truck driver. Plaintiff quit his employment in December 2000.

As an employee of Defendant BIS, Plaintiff Trominski enrolled in Defendant BIS's health benefits plan in January 2000. The Plan is funded by Defendant BIS and plan participants. (Ar. 19.) Defendant BIS is the Plan Administrator, and a consulting company called Mid-America Associates, Inc., (hereinafter "Mid-America") is the Plan's Third Party Administrator. (Ar.19, 28, 66.) Defendant Manzo owns and operates Defendant BIS, and he denied Plaintiff Trominski's medical claims on behalf of Defendant BIS.

In June 2000, approximately five months after enrolling in the Plan, Plaintiff Trominski began seeking treatment for severe chest pain that he experienced in March or April of 2000. It is undisputed that Plaintiff Trominski was born with a congenital heart defect requiring two heart surgeries before he reached the age of 3. Medical records also indicate that in 1987, at approximately age 17, Plaintiff experienced "residual pulmonary insufficiency secondary to his corrective surgery." (Ar. 302.)

In the fall of 2000, Plaintiff Trominski's doctor recommended treatment for the chest pain, noting that Plaintiff had "congenital heart disease and evidence of severe tricuspid regurgitation and right ventricle dysfunction . . . ." (Ar. 303.) The treatment included a heart catheterization, performed in December 2000, and a heart valve replacement, performed in January 2001. Both procedures were done by Plaintiff U of M and resulted in charges allegedly in excess of $60,000.00.

Plaintiff also underwent a bone scan on  June 13, 2001, at Plaintiff HVSH.  (Ar. 876-77.)  As a condition of receiving treatment, Plaintiff assigned his rights to any employee benefits under ERISA to Plaintiffs U of M and HVSH.

In December 2000, between the heart catheterization and the heart valve replacement, Plaintiff Trominski voluntarily quit his employment to allegedly pursue a real estate career in Florida.  He also elected to continue his medical coverage under the Consolidated Omnibus Budget Reconciliation Act (hereinafter "COBRA") amendments to ERISA.  *See* 29 U.S.C. § 1162.  Plaintiff claims that after he quit, but before the heart valve replacement, he specifically asked Defendant Manzo if the valve replacement would be covered:

> I called Manzo and I said this needs to be done, would it be covered through the insurance that I'm paying right now and he told me specifically it would be covered.  I had been there for more than a year and I paid my COBRA already, and I elected to take the COBRA . . . and he said that no matter what the cost was it wouldn't be pre-existing and he would pay for it despite whatever the final cost would be.  And based on him telling . . . me that, that's when I called Dr. Lloyd back and that's when I scheduled for the surgery.  I did not schedule the surgery until after Manzo specifically told me, go ahead, take care of yourself and we'll pay . . . the bill no matter what it costs.

Trominski Dep. at 113.  Plaintiff alleges that his doctor told him that the surgery should be done within a year and that it was not an emergency situation.  Because it was not an emergency, Plaintiff asserts that he would not have had the surgery had he known that it was not going to be covered.  *See id.* at 112.  He further alleges that after the surgery he began experiencing arrhythmia, which was not present before the surgery.  Although medication stops the arrhythmia, Plaintiff alleges that he cannot afford the medication without health insurance.  *See id.* at 113.  Defendant Manzo testified that he did not remember speaking with Plaintiff about whether the surgery would be covered.  *See* V. Manzo Dep. at 29.

4

Defendants have not covered any of the medical expenses incurred by Plaintiff Trominski. Defendant BIS denied Plaintiff Trominski's January 2001, heart valve replacement claim on July 5, 2001, and, according to Plaintiff, Defendant BIS has not taken any action on the claim for the December 2000, heart catheterization or the June 13, 2001 bone scan. Defendant Manzo testified in his deposition that after he received the bill for Plaintiff's heart valve replacement, he began to "smell something here . . . [t]his guy, he leaves, he goes on COBRA and two weeks later he's in the hospital. And I looked at his application; no preexisting condition, nothing about a heart problem. So I put my people to work to review it." V. Manzo Dep. at 30.

One of the individuals Defendant Manzo hired to investigate Plaintiff's medical claims is an individual named Charles Garavaglia. Before purchasing Defendant BIS, Defendant Manzo worked for Mr. Garavaglia, who was the previous owner of Defendant BIS. *See* V. Manzo Dep. at 11. Defendants maintain that Mr. Garavaglia's investigation revealed primarily two things: (1) Plaintiff had omitted previous employers from his employment application and (2) Plaintiff misrepresented the condition of his health on his application for health coverage under the Plan.

With respect to the employment history, Defendant BIS's employment application required Plaintiff to "[g]ive a complete and consecutive history of your employment for the past ten years, starting with your present or most recent employer. Account for every month." (Ar. 148.) The first employer listed by Plaintiff was "Georgia International X-press." *Id.* Plaintiff indicated that he worked for Georgia International Express from October 1998 until January 1999. Thus, a cursory reading of Plaintiff's application reveals that Plaintiff did not account for approximately one year of employment history that immediately preceded his application for employment with Defendant BIS in January of 2000. Defendant Manzo stated in his deposition that although he reviews each

5

application "carefully," he "must have missed" Plaintiff's omission.  V. Manzo Dep. at 41.  Another question asked Plaintiff to state whether he had ever been discharged from a previous employer. (Ar. 149.)  Plaintiff answered "no."  (Ar. 149.)

Defendants maintain that Plaintiff intentionally omitted a previous employer called Great Lakes Petroleum Corporation (hereinafter "Great Lakes").[1]  It is undisputed that Plaintiff worked for Great Lakes for approximately three weeks between November 13, 1999, and December, 1999. Plaintiff admitted in his deposition that he did not list Great Lakes on his application. *See* Trominski Dep. at 20.

Defendants claim that Plaintiff omitted any reference to Great Lakes on the application because Great Lakes fired him for staying home and getting drunk instead of coming into work. When Plaintiff filed for unemployment benefits after his employment with Great Lakes ended, Great Lakes sent the following statement to the Michigan Unemployment Agency, describing the termination as follows, in pertinent part:

> On December 8th, Alan came in early, before being called; and found that the truck was not in, so he left.  When the dispatcher called him, to let him know the truck was in the yard, he got no answer.  He tried repeatedly to reach him, and finally had to reassign the loads, so our customers would not run out of fuel.  When he finally did hear from Alan, he found he had been out drinking all day, and was still drunk. Since it was a work day for Alan, and he spent it drinking, he was fired. . . .  We do not feel we should pay unemployment to Alan.  If he had been interested in keeping his job, and had shown better judgment, we would not have had problems with him.

(Ar. 846-47.)  Although Plaintiff testified that he "assumed" that he was fired because he "didn't come back in," *id.* at 30, he now believes that he "voluntarily quit," or at least that it was

---

[1] Great Lakes Petroleum is also referred to as Superior Management Group, Inc., in the administrative record.  (Ar. 846); Trominski Dep. at 80.

6

"ambiguous as to how [he] left." *Id*. at 82.  Plaintiff described the termination of his employment

with Great Lakes as follows:

> It was kind of complicated.  I wasn't given a schedule and I went in
> there one day when I was scheduled - or I was told to come in.  And
> the supervisor there told me to come in early, I came in early and
> when I showed up there, they didn't have a truck for me to use.  They
> had problems for whatever reason and they told me to go home, and
> I told them if I go home I'm not coming back out again that day
> because I was supposed to work the day shift.
>
> So, I went home and they called me in the evening at about 5:00 or
> 6:00 p.m., and then they said they wanted me to come in in the
> evening and work a 12-hour shift.  That's about - by the time I started
> it would have been 7:00 p.m. and I'd have to work until 7:00 a.m.  I
> said, I would have been up for 24 hours having worked the last 12 of
> them straight. . . .  They said if I didn't come back that I would be
> fired.  And I said I was already in there today when I was told to so
> I'm not coming in again, and that's where it was left and I never went
> in again.

Trominski Dep. at 29-30.  Thus, Plaintiff argues that because he quit his employment with Great

Lakes, he was being truthful when he denied being fired from any previous employer on his

employment application.

As for the application for health coverage, it required Plaintiff to indicate whether he had any

"indication, diagnosis, consultation, treatment, taken any medication, or received counseling for,"

among other things, a "heart or circulatory disorder," "joint disorder," or "birth defects," within the

past five years. (Ar. 521.)  Plaintiff answered "no."  (Ar. 521.)  Defendant Manzo's investigation,

however, revealed that Plaintiff told his doctor he had been having episodes of chest constriction and

shortness of breath in the "past few years."  (Ar. 302.)  In his deposition, Plaintiff admitted to "one

or two" such episodes in the years preceding his employment with Defendant BIS.  Trominski Dep.

at 61.  Plaintiff also admitted telling his physician about his shortness of breath, but he maintained

7

that he did not believe it had anything to do with his heart.  He claimed that he thought at the time that it was just a breathing problem, asthma, or possibly an allergic reaction.  *See* Trominski Dep. at 62, 117.  According to Defendant Manzo's investigator, however, Plaintiff admitted during a phone conversation that he has "had heart problems all his life . . ." stemming from congenital heart disease.  (Ar. 128.)  The investigation also revealed that on June 5, 2001, Plaintiff told his rheumatologist that he "had joint pain for two years in his right greater than left hip and sacroiliac area, and a lot of joint pain for at least 10 to 15 years with morning stiffness lasting all day long at times."  (Ar. 906-907).  This information was uncovered after Plaintiff Trominski quit, after he elected continuation coverage under COBRA, and after he received both heart surgeries.

In a July 5, 2001, letter, Defendant Manzo denied Plaintiff's medical claims, stating as follows:

> We have completed our investigation of your health claim stated above.  It is denied for the following reasons:
>
> 1.    Falsified application for Employment
> 2.    Falsified application for Health Insurance in reference to Pre-Existing Condition
> 3.    Failure to cooperate in the investigation of your claim
> 4.    Failure to answer written communication for additional information sent to you by the third party administrator Mid-America

(Ar. 124.)  The references to Plaintiff's failure to cooperate and failure to answer written communications were apparently based on Defendant Manzo's belief that Plaintiff had not responded to certain requests from Mid-America, the Plan's Third-Party Administrator.  In his deposition, however, Defendant Manzo was shown a letter from Mid-America indicating that Plaintiff did respond to Mid-America's requests.  After reading the letter, Defendant Manzo stated: "Well, this letter says that he did reply.  I'm sorry."  V. Manzo Dep. at 51.  Nevertheless, when

8

Plaintiff's counsel pointed out that Mid-America apparently disagreed with Defendant Manzo's conclusion that Plaintiff had ignored Mid-America's requests, Defendant Manzo stated that he "disagree[d] with Mid-America." V. Manzo Dep. at 52. Defendant Manzo could not, however, produce any documentation to show that Plaintiff had not cooperated with either the investigation or Mid-America. *See* V. Manzo Dep. at 52-53.

After the initial denial of his claims, Plaintiff Trominski's counsel attempted to persuade Defendant BIS and Defendant Manzo to reconsider the denial. On October 9, 2001, Plaintiff Trominski's counsel sent Defendant Manzo a letter requesting that the claims be paid and warning Defendant Manzo of the penalties for failing to comply with ERISA and its related regulations. *See* Plaintiff's Motion for Judgment on the Record and for Summary Judgment, at Ex. B. Defendant Manzo replied on October 18, 2001, denying liability on behalf of Defendant BIS and "reaffirm[ing] its denial" of Plaintiff Trominski's claim. Apparently, however, additional review was undertaken by Defendant BIS because on July 10, 2002, in a letter to Plaintiff Trominski's counsel, Defendant Manzo indicated that "[u]ntil we complete our review with all of the facts from former employers, doctors, hospitals and insurance companies, we cannot say what the position will be." (Ar. 212.) The administrative record does not indicate whether this review was ever formally completed.

**B.    Procedural History**

Having failed to receive a favorable review of his claim, Plaintiff Trominski filed his Complaint on August 8, 2002, alleging the following five counts:

| | |
|---|---|
| Count I | Claim for Benefits |
| Count II | Violation of COBRA |
| Count III | Violation of ERISA 503 |
| Count IV | ERISA 502(C) |
| Count V | Breach of Fiduciary Duty |

9

*See* Complaint.  Plaintiff Trominski subsequently amended his Complaint to add an additional claim

for benefits, (Count VI), on behalf of his assignees, Plaintiff U of M and Plaintiff HVSH.

collectively. Plaintiff asserted that Defendant BIS arbitrarily and capriciously denied his claims for

medical benefits.  In addition, because Plaintiff Trominski's employment ended before the denial

of his claims, he alleged that Defendants violated COBRA and its amendments to ERISA.  Finally,

Plaintiff alleged that Defendants violated ERISA claims procedures and that both Defendant BIS

and Defendant Manzo breached their fiduciary duties.

On December 5, 2003, the Court remanded this matter back to the Third Party Administrator,

Mid-America, for an appeal required by the terms of the Plan.  When the parties first submitted

cross-motions for judgment on the administrative record in September 2003, neither indicated

whether Plaintiff Trominski's claims were ever appealed beyond the initial denial.  The Plan

provides that whenever a claim for benefits is denied, the covered person may appeal the decision

within 60 days to the Third Party Administrator for a "full and fair review."  (Ar. 64.) ("Upon

request for review, the person in charge of the local personnel office of the Company shall arrange

a full and fair review of the claim *by the Third Party Administrator*.") (emphasis added).  Under 29

U.S.C. § 1133(2), every employee benefit plan must "afford a reasonable opportunity to any

participant whose claim for benefits has been denied for a full and fair review by the appropriate

named fiduciary of the decision denying the claim."  In addition, under regulations in effect when

Plaintiff filed his claims, employee benefit plans were required to notify participants of

"[a]ppropriate information as to the steps to be taken if the participant or beneficiary wishes to

submit his or her claim for review."  *See* 29 C.F.R. 2560.503-1(f).  Plaintiff argued that he was never

notified of his right to appeal.  Since it did not appear that Plaintiff was informed of his right to an

10

appeal, nor did it appear that any "full and fair" review was completed by Third Party Administrator as required by the Plan, the Court remanded this matter under *VanderKlok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 616-17 (6th Cir. 1992).[2] *See Trominski v. Business Interlink Servs. Inc.*, No. 02-73176 (E.D. Mich. Dec. 5, 2003) (hereinafter "*Trominski I*").

After remand, Defendants' counsel submitted a document entitled "Final Decision With Respect to Plaintiff Trominski's Claims." Attached to the document were two letters, one from Mid-America and another from Defendant Manzo in his capacity as an officer of Defendant BIS. Both letters were dated March 3, 2004. The letter from Mid-America explained only that Mid-America is not a plan fiduciary and, therefore, "does not control or have responsibility concerning the final disposition of any claim made to the Plan." Mid-America also stated that "[t]he Plan renders and is responsible for final determination of all claims made to the Plan." Thus, although the Plan requires Mid-America to conduct a "full and fair" review at the appeals stage of the claim process, if Defendant BIS as the Plan Administrator disagrees with any of Mid-America's findings, the appeal appears to be pointless.

The letter submitted by Defendant Manzo is addressed to Plaintiff Trominski and it sets forth Defendant Manzo's reasons for affirming his earlier decision to deny Plaintiff's claim.[3] His letter

---

[2] The Court also granted Plaintiff's claim that Defendant BIS failed to provide a summary plan description for more than a year after Plaintiff requested it. *See* 29 U.S.C. 1132(c) (An administrator who fails to "comply with a request for any information which such administrator is required by this subchapter to furnish to a participant. . . within thirty days after such request may in the court's discretion be personally liable to such participant . . . in the amount of $100 per day from the date of such failure or refusal . . . ."). The Court imposed a fine of $10,325.00, which is less than 25 percent of the maximum fine authorized by the statute.

[3] Current ERISA regulations require an appeal "that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan *who is neither the individual who made the adverse benefit determination that is the*

states that "[w]e independently and thoroughly reviewed all the evidence presented during the course of the claim, including depositions, motions, and briefs filed in the Federal Court litigation, and determine that the previous decision to deny benefits was correct."  V. Manzo Letter, at 1. Defendant Manzo also quotes his own affidavit in which he claims: "If I knew that Trominski failed to disclose [his] last employment, that he was previously fired, that he failed to appear for work as scheduled, or that he had recurrent symptoms from serious heart disease, I would have rejected his employment application."  V. Manzo Letter, at 2.  Defendant Manzo's letter also repeats Defendants' earlier arguments before remand; specifically, (1) Plaintiff's omission of Great Lakes as a previous employer constituted gross misconduct justifying a retroactive denial of COBRA benefits, and (2) Plaintiff's misrepresentations on his health coverage application render the contract for medical benefits voidable by Defendant BIS.

On March 11, 2004, Mid-America filed a number of documents with the Court.  According to these documents, the March 3, 2004, Mid-America denial letter that Defendants filed on March 4, 2004, was not the actual final denial letter.  Instead, according to Mid-America, the letter submitted by Defendants was a "prior determination from December 9, 2003, before Mid-America was aware of the court's order and before the appeal review was performed . . . ."  March 10, 2004, Letter from Mid-America.  Mid-America claims that the March 3, 2004, letter "was redacted and

_subject of the appeal, nor the subordinate of such individual_."  29 C.F.R. § 2560.503-1(h)(3)(ii) (emphasis added).  Defendant Manzo was responsible for the initial denial, the "administrative review" that took place during 2001 and 2002, (Ar. 184, 212-215, 218, 219, 220, 229, 232), and the appeal that took place post-remand.  Nevertheless, Defendant Manzo need not comply with subsection (h)(3)(ii) because the effective date of that portion of the regulation was January 1, 2002, after Plaintiff filed his claims.  _See_ 66 Fed. Reg. 35886 (July 9, 2001).  Thus, Defendant Manzo was apparently free to review his own decision and rely on his own affidavit in support of the appeal determination.

submitted as if it were the claim review." *Id.* In other words, Mid-America either sent or was going to send a letter to Plaintiff denying the medical claims on December 9, 2004, before it was aware of the Court's order requiring Mid-America to conduct a "full and fair" review of Defendant Manzo's initial denial, pursuant to the terms of the Plan. (Ar. 64.) This was the letter that was submitted to the Court by Defendants as if it set forth Mid-America's findings on remand. Mid-America, however, sent a new denial letter to Defendants' counsel on March 1, 2004, after learning of the Court's order. *See* Mid-America Fax Cover Sheet. This denial letter provides as follows, in pertinent part:

> Mid-America's responsibility is to determine whether per the language of the Business Interlink's Plan Document, you were entitled to health benefits during your period of eligibility with the Plan.

> Following an extensive pre-existing investigation and a five-year application misrepresentation review, Mid-America was unable to confirm that your heart condition was pre-existing. The five-year misrepresentation review failed to provide proof that you were treated for the heart condition within the five years preceding the date you signed your health application. Mid-America does acknowledge that you had a known heart condition and you received prior treatment for such. However, the review did not confirm receiving heart care or treatment within the five year review period.

> Mid-America's determination was to pay all heart related expenses. Claims were processed and checks issued by Mid-America during 5/2001. In December 2001, the checks were returned by Business Interlink Services advising that you misrepresented information on your Employment Application. As such, it was the position of Business Interlink that they would not have hired you, therefore, you were not entitled to Plan benefits. Mid-America was advised to void all checks and reissue no-payment explanations of benefits to all providers. This was completed by Mid-America on 1/3/03. All denials to providers indicate the reason for denial as "Denied Due to Misrepresentation."

> It is not the responsibility of Mid-America Associates to consider the

13

> employment aspects in this case, that is the responsibility of Business
> Interlink Services.  Although based upon our medical pre-existing
> investigation we made the determination to issue payment, Business
> Interlink as the Plan Fiduciary has full discretionary authority over
> the Plan and is responsible for rendering the final determination of all
> claims. . . .

March 1, 2004, Letter From Mid-America.  This denial letter was not submitted to the Court by

Defendants.  Instead, Defendants submitted a re-dated version of Mid-America's earlier December

9, 2004, denial letter that was drafted "before Mid-America was aware of the court's order and

before the appeal review was performed . . . ."  March 10, 2004, Letter from Mid-America.

None of the parties actively pursued this case after March 2004.  On November 30, 2004,

the Court set January 12, 2005, as the deadline for filing cross-motions for judgment on the

administrative record in light of Defendant BIS's denial of the claim appeal.  Since Plaintiff has not

alleged any procedural deficiencies in the manner in which his claim was reviewed on remand, the

remaining claims in this matter are Claim for Benefits (Counts I and VI), Violation of COBRA

(Count II), and Breach of Fiduciary Duty, (Count V).

### III. LEGAL STANDARD

**A.      Summary Judgment Under Rule 56**

Summary judgment is appropriate only if the answers to interrogatories, depositions,

admissions, and pleadings combined with the affidavits in support show that no genuine issue as to

any material fact remains and the moving party is entitled to a judgment as a matter of law.  *See* FED.

R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring

the non-moving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986) (citations omitted).  In application of this summary judgment standard,

14

the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## B.   ERISA Standard of Review

A separate legal standard applies to the extent that a plaintiff seeks to recover benefits under an employee benefits plan. In the Sixth Circuit, "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998). Accordingly, in *Wilkins v. Baptist Healthcare System Inc.,* 150 F.3d 609, 619 (6th Cir. 1998), the Sixth Circuit held that "the summary judgment procedures set forth in [FED. R. CIV. P.] 56 are inapposite to ERISA actions and thus should not be utilized in their disposition." Therefore, to the extent that Plaintiff seeks to remedy the denial of benefits, the Court is limited to reviewing only the

15

information contained in the administrative record.  According to Defendant Manzo's final denial letter on remand, he considered "all the evidence presented during the course of the claim, including depositions, motions, and briefs filed in the Federal Court litigation . . . ."  V. Manzo Letter, at 1.

In evaluating an administrator's denial of benefits under an ERISA governed plan, courts must apply a *de novo* standard of review unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Williams v. Int'l Paper Co*., 227 F.3d 706, 710 (6th Cir. 2000).  The *de novo* standard of review applies to both the factual determinations and legal conclusions of the plan administrator.  *See Wilkins* 150 F.3d 613.

In contrast to the *de novo* standard, federal courts review the administrator's decision under an "arbitrary and capricious" standard when the plan clearly confers discretion upon the administrator to determine eligibility or construe the plan's provisions.  *See Wells v. U.S. Steel & Carnegie Pension Fund, Inc.,* 950 F.2d 1244, 1248 (6th Cir. 1991).  The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)).  In applying this standard, the Court must defer to the administrator; an administrator's determination will be overturned only upon a showing of internal inconsistency in the plan, bad faith, "or some other ground for calling the [administrator's] determination into question . . . ." *See Davis,* 887 F.2d at 695.  When an administrator is acting under a conflict of interest, however, the conflict must be taken into account to determine the proper deference to afford the plan administrator. *See Firestone*,

16

489 U.S. at 115 (noting that courts should be attentive to conflicts of interest); *Davis*, 887 F.2d at

693-94 (noting the potential for a conflict of interest when an employer acts as plan administrator).

In the present case, since the Plan provides that "it is the express intent of this Plan that the

Plan Administrator shall have discretionary authority to construe and interpret the terms and

provisions of the Plan [and] to make determinations regarding issues which relate to eligibility for

benefits . . . , " (Ar. 66.), the Court will apply an "arbitrary and capricious" standard of review to

Defendant BIS's decisions under the Plan. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th

Cir. 1998). Additionally, however, the Sixth Circuit has made it clear that when an employer also

acts as an administrator of a self-funded benefit plan, an actual conflict of interest exists which must

be considered in determining whether the employer/plan administrator's decision was arbitrary and

capricious. *See Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 521 (6th Cir.

1998) (holding that where an employer also acts as an administrator of a plan that it funds, "there

is an actual, readily apparent conflict . . ., not a mere potential for one."); *Stephens v. Westinghouse

Benefits Plan*, No. 99-6144, 2001 WL 45249, * 4 (6th Cir. Jan. 12, 2001) ("[T]his court has

expressly rejected the notion that the conflict of interest inherent in a self-funded and -administered

plan alters the standard of review. Instead, that fact should be taken into account as a factor in

determining arbitrariness or capricious.") (citing *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 435

(6th Cir. 1998)). With these considerations in mind, the Court will now turn to the parties'

arguments.


## IV.  ANALYSIS

### A.    Plaintiff's Denial of Benefits Claim

17

It is undisputed that Plaintiff Trominski quit his employment with Defendant BIS and elected to continue his medical coverage under the COBRA amendments to ERISA. The COBRA amendments to ERISA require an employer who sponsors a group health plan to give the plan's "qualified beneficiaries" the opportunity to elect "continuation coverage" under the plan when the beneficiaries might otherwise lose coverage because of certain "qualifying events." *See* 29 U.S.C. § 1161(a)-(b). "Qualifying events" include "termination (other than by reason of such employee's gross misconduct) . . . ." *See* 29 U.S.C. § 1163(2). "Termination" is not defined in the statute, but it has been held to include voluntary resignation. *See Sigurdson v. Southmark-National Heritage, Inc.*, 1992 WL 331438, * 5 (D. Kan. 1992) (noting that the legislative history of COBRA refers to termination as "the separation from service of the covered employee (whether voluntary or involuntary)"); *see also* 26 C.F.R. § 54.4980B-4 (termination can be voluntary or involuntary).

Defendants admit that Plaintiff Trominski resigned his employment in December 2000. Defendants claim, however, that because Plaintiff Trominski could have been fired for gross misconduct at the time of his resignation, the denial of his medical claims was not arbitrary or capricious. In addition, Defendants maintain that Plaintiff's allegedly false answers on his group health coverage application renders any agreement to provide medical benefits voidable by Defendant BIS under traditional contract principles. Finally, Defendants maintain that Plaintiff is precluded from asserting a denial of benefits claim because he assigned the right to payment of benefits to Plaintiffs U of M and HVSH.

Plaintiff responds by arguing that at the time he completed his employment application, he believed that he voluntarily quit his employment with Great Lakes; thus, he maintains that his omission did not constitute gross misconduct. Plaintiff also argues that even if the omission did

amount to gross misconduct, he quit his employment with Defendant BIS.  Therefore, Plaintiff argues that he could not have been terminated "*by reason of* . . . gross misconduct" under COBRA. 29 U.S.C. § 1163(2) (emphasis added).  Plaintiff further argues that even if Defendant BIS could properly deny a medical claim based on after-acquired evidence of alleged gross misconduct, Defendant BIS could only deny any claims arising after the discovery of the misconduct.  *See McKennon v. Nashville Banner Publishing, Co.*, 513 U.S. 352, 362 (1995) (holding that although equitable principles allow an employer in a wrongful discharge case to put forth after-acquired evidence of an employee's misconduct as a legitimate reason for termination, the aggrieved employee is nevertheless entitled to recover backpay from the date of the unlawful discharge to the date the after-acquired evidence was discovered).  Thus, Plaintiff argues that Defendants are precluded from retroactively cancelling coverage based on misconduct uncovered after the claims have been submitted.  Plaintiff also asserts that he truthfully answered the questions posed to him by the health insurance application.  Plaintiff did not respond to Defendants' contention that his claims are barred because he assigned his rights to benefit payments to Plaintiff U of M and Plaintiff HVSH.

The Court will address the parties' arguments below.

1.      *Whether the Omissions in Plaintiff's Employment Application Warrant Retroactive Cancellation of Medical Coverage*

Each party claims that the issue of whether after-acquired evidence can legitimately support a retroactive termination of COBRA continuation coverage is an issue of first impression.  The Court notes, however, that the issue has been mentioned, but not extensively discussed, by various courts.  *Compare Jones v. Officemax, Inc.*, 38 F. Supp. 2d 957, 961 (D. Utah 1999) (ERISA penalty assessed against employer for failing to issue COBRA election notice notwithstanding after-acquired

evidence of employee drug use), *and Conery v. Bath Associates*, 803 F. Supp. 1388, 1396 (N.D. Ind. 1992) (holding that employer's agreement to allow employee to resign despite gross misconduct waived the employer's right to deny COBRA continuation benefits); *with Karby v. Stardard Products Co.*, 1992 WL 333931, *6 (D.S.C. 1992) (holding that COBRA continuation benefits can be denied if after the termination it was discovered that the employee had engaged in gross misconduct), *and Mlsna v. Unitel Communications, Inc.*, 41 F.3d 1124, 1128, n. 2 (7th Cir. 1994) ("*Milsna I*") ("An employee could quit his job and his employer could later discover facts leading it to change the employee's departure status to termination for gross misconduct. [W]e simply note that it would be strange for an employee to have the power to preempt his employer's decision to terminate him for gross misconduct."). Although these decisions represent different opinions on whether after-acquired evidence of gross misconduct may justify denying COBRA benefits, none of these decisions support Defendants' position.

Statutory terms must be accorded their plain and ordinary meaning. *See Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1058 (6th Cir. 1994). Section 1163 provides that COBRA continuation coverage must be provided upon the happening of certain "qualifying events" including "termination (other than *by reason of* such employee's gross misconduct) . . . ." *See* 29 U.S.C. § 1163(2) (emphasis added). Defendants' argument that COBRA benefits may be denied where the employee quits and the employer later discovers that it *could* have fired the employee for the alleged misconduct reads the words "by reason of" out of the statute. *See Mlsna I*, 41 F.3d at 1131 (Cudahy, J., concurring in part and dissenting in part) ("The statute states that 'termination' is a qualifying event. This occurs, surely, when an employee stops working. The gross misconduct provision, however, looks to the reason for which an employee stops working (i.e., the *cause* of the termination).") It is

20

impossible for one's employment to be "terminated," in the voluntary sense of the word, "by reason of gross misconduct." 29 U.S.C. § 1163(2). In other words, even assuming that an employer could change an employee's departure status from voluntary to involuntary based on after-acquired evidence of gross misconduct, which is an issue that this Court need not decide, the change in departure status must actually take place for there to be a termination for gross misconduct. *See Mlsna v. Unitel Communications, Inc.*, 91 F.3d 876, 882-83 (7th Cir. 1996) ("*Milsna II*") (noting that although "it would be strange for an employee to have the power to preempt his employer's decision to terminate him for gross misconduct [by quitting first]," the defendant had submitted no evidence "that it initially or formally *designated* Mlsna's termination as one for gross misconduct.") (emphasis and alteration in original); *Karby*, 1992 WL 333931, at * 6 (upholding the employer's decision to change the former employee's separation from "a release to a discharge for gross misconduct" based upon after-acquired evidence of theft and false statements.").

Based on the evidence of record, Defendant BIS never formally or informally terminated Plaintiff's employment for gross misconduct. Instead, Defendant BIS has consistently argued that Plaintiff quit his employment. *See* Defendants' Answer to Plaintiffs' Motion to Overturn Administrative Decision, at 1 ("Here, Trominski was not fired. He simply 'never showed up for work.' AR 0153. Also see AR 0155 ('you are considered to have quit your job') and AR 0157 (Trominski 'voluntarily resigned')."). Defendants fail to explain how an employee may quit "by reason of gross misconduct." 29 U.S.C. § 1163(2). If Congress wanted to allow benefit plans to deny COBRA benefits where an employee "could" have been terminated "by reason of gross misconduct," it would have done so. There are legitimate reasons, however, for limiting the penalty provision to situations where the alleged gross misconduct actually motived a decision to terminate

21

the employee's employment.  *See Mlsna I*, 41 F.3d at 1131 (Cudahy, J., concurring in part and

dissenting in part) ("The gross misconduct provision is punitive and ought to be interpreted

narrowly."); *Jones*, 38 F. Supp. 2d at 961 ("this Court is leery of creating an incentive for employers

to accuse employees of gross misconduct after-the-fact.").  Accordingly, the Court finds that the

omission of Great Lakes from Plaintiff's employment application does not support the denial of

benefits.[4]

> 2.   *Whether Plaintiff's Alleged Misrepresentations on his Health Coverage Application
>       Render the Contract for Health Coverage Voidable*

Defendants also argue that Plaintiff's medical expenses are not covered because Plaintiff

indicated on his health coverage application that he had not had any "indication" of a "heart or

circulatory disorder" within the preceding five years when he knew that he had been having episodes

of chest constriction and shortness of breath in the "past few years."  (Ar. 302.)  Defendants also

claim that Plaintiff misrepresented on the application that he had no "indication" of "birth defects"

within the five year period because Plaintiff should have connected the shortness of breath and chest

constriction to the heart problems he had as an infant.  Finally, Defendants argue that Plaintiff

misrepresented that he had no "indication" of a "joint disorder" within five year period (Ar. 141),

---

[4] The Court determined above that Defendant BIS is entitled to an arbitrary and
capricious standard of review.  The issue of whether an employer may deny COBRA benefits
based on after-acquired evidence of misconduct is a question of law, however, not of plan
interpretation or factual determination.  *See Penn v. Howe-Baker Engineers, Inc.*, 898 F.2d 1096,
1100 (5th Cir. 1990 ) ("[I]n contrast to the great deference we grant the Committee's
interpretations of the Plan, we accord no deference to the Committee's conclusions as to the
controlling law, which involve statutory interpretation.  The interpretation of ERISA itself must
be made *de novo* by the court."); *see also Holt v. Winpisinger*, 811 F.2d 1532, 1536 (D.C. Cir.
1987) ("We owe no more deference to the District Court when deciding questions of law than
that court owed to the Plan's Administrators.").  Therefore, Defendant BIS's belief that it may
properly deny COBRA benefits based on after-acquired evidence of alleged misconduct is
entitled to no deference.

because on June 5, 2001, he told his rheumatologist that he had "a lot of joint pain for at least 10 to 15 years with morning stiffness lasting all day long at times." (Ar. 906-907). Plaintiff responds by arguing that he only had "one or two" episodes of shortness of breath, which he attributed to asthma or an allergy, in the years leading up to his employment with BIS. Plaintiff did not respond to Defendants' assertions regarding his joint pain or alleged birth defects.

Because ERISA does not include a provision relating to misstatements in an application for benefits, federal common law governs the issue. *See Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943-44 (6th Cir. 1997); *Tingle v. Pac. Mut. Ins. Co.*, 996 F.2d 105, 107-110 (5th Cir. 1993); *McDaniel v. Med. Life Ins. Co.*, 195 F.3d 999, 1002 (8th Cir. 1999). Federal common law supports the rescission of a contract for insurance that is obtained through material misstatements or omissions of the insured. *See Davies*, 128 F.3d at 943. In addition, the misrepresentation need not be related to the specific condition for which the insured sought treatment. *See id.* at 944. It is enough that the misrepresentation or omission "materially affect[ed] the insurer's risk or the hazard assumed by the insurer." *Id.* (quoting *Tingle v. Pacific Mut. Ins. Co.*, 837 F. Supp. 191, 193 (W.D. La. 1993)). Statements or omissions are deemed "material" if they could "reasonably be considered as affecting the insurer's decision to enter into the contract or its evaluation of the degree or character of the risk, or its calculation of the premium to be charged." *Id.* at 944 (quoting Barry R. Ostranger & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 3.01(d) (6th ed. 1993)); *Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 905 (8th Cir. 2003) ("In cases governed by ERISA, misstatements or omissions have been deemed material where knowledge of the true facts would have influenced the insurer's decision to accept the risk or its assessment of the premium amount."); 6 COUCH ON INSURANCE § 82:13 (3d ed.) ("Broadly speaking, the test of

23

materiality is whether the fact or circumstance represented or misrepresented operated to induce the insurer to accept the risk, or to accept it at a lower premium."); *Tingle*, 837 F. Supp. at 193 ("[I]n the context of an insurance policy, in order to avoid a policy, the insurer must prove that the insured made a fraudulent or material misrepresentation in his application for enrollment that justifiably induced the issuance of the policy.").

The Court finds that Defendant BIS acted arbitrarily and capriciously in relying upon Plaintiff's alleged misrepresentations to deny his medical claims. First, Plaintiff's alleged misrepresentation involving joint pain did not render the health coverage voidable because Defendants have not shown that the alleged misrepresentation was material. The administrative record lacks evidence that Plaintiff's denial of a joint disorder affected any decision to employ him or to offer him benefits. Nor is there any evidence that if Plaintiff had admitted to having joint pain within the last five years that he would have been required to contribute more to the Plan or pay higher COBRA premiums. *See e.g.*, *Shipley*, 333 F.32d at 905 (finding the plaintiff's misrepresentations material because the defendant's underwriting guidelines showed that the defendant would have treated the plaintiff's application differently had he truthfully disclosed his medical history); *Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 641-42 (5th Cir. 2004) (finding that insured's misstatements were material because the insurer's "administrator testified that he would not have issued [the insured] a policy if he had known of her prior suicide attempt, her continuing history of depression, or her continuing treatment for alcohol use."); *Massachusetts Cas. Ins. Co. v. Reynolds*, No. 1:94-CV-194, 1998 WL 1158403, * 11 (E.D. Tenn. July 16, 1998) (finding the insured's misrepresentation "materially affected the risk of loss underwritten" by the insurer because the underwriting manual clearly advised that the application

24

should have been denied given the insured's medical history).  In addition, the absence of any indication from the application that pre-existing conditions are excluded further supports the finding that any misstatements about joint pain were immaterial.  *See Shipley*, 333 F.3d at 905 (noting that "the fact that the questions were contained in an application form that clearly limited coverage for preexisting conditions indicates that [the plaintiff's] answers to those questions were relevant for determining the extent of his coverage and his premium amounts.").  Indeed, the only preexisting conditions that are excluded under the Plan, which are not mentioned on the application, are those conditions "for which medical advice, diagnosis, care or treatment was recommended or received within the six (6) months prior to a person's Enrollment Date."  (Ar. 0108.)  There is no evidence that Plaintiff was offered medical advice, diagnosis, or treatment for his alleged joint problems within the six months prior to enrolling.  Accordingly, in the absence of any evidence that the Plan relied on Plaintiff's answer to the question regarding joint disorders in (1) evaluating its risk, (2) making a decision to offer benefits, or (3) determining the amount of contribution or COBRA premiums, the Court finds that Plaintiff's statement, even if false, would not be material.[5]

Second, the Court finds that it was arbitrary and capricious for Defendant Manzo to determine that Plaintiff falsely denied having any "indication" of a "heart or circulatory disorder" or "birth defect" in the preceding five years.  To demonstrate materiality, Defendants rely on Defendant Manzo's affidavit in which he claims that had he known Plaintiff "had recurrent symptoms from serious heart disease," he would have "rejected [Plaintiff's] employment application."  (Ar. 892.)  There was no basis, however, for rejecting Plaintiff's explanation that he

---

[5] It should be noted that Defendant Manzo testified that he considered Plaintiff's answer to the question about heart disorders to be Plaintiff's only false statement.  *See* V. Manzo Dep. at 48.

25

thought the shortness of breath and chest constriction was simply a breathing problem, or possibly asthma. *See* Trominski Dep. at 62, 117. Plaintiff testified that he had no pain associated with the episodes of shortness of breath, and he also testified that his doctor told him that these episodes were probably not related to the subsequent chest pains for which he ultimately sought treatment. *See* Trominski Dep. at 62-63. Indeed, simple reference to a medical manual reveals that shortness of breath and chest tightness are symptoms of asthma.[6] *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY, at 558 (Mark H Beers, M.D., and Robert Berkow, M.D. *et al.* eds., 17th ed. 1999) ("An asthmatic usually first notices dyspnea, cough, shortness of breath, and tightness or pressure in the chest and may hear wheezes."). Defendants have pointed to no medical evidence that Defendant Manzo relied upon to determine that Plaintiff's "one or two" episodes of shortness of breath and chest constriction in the years leading up to his employment were "indication[s]" of a "heart or circulatory disorder" or "birth defect." Thus, even assuming that Defendant Manzo's self-serving affidavit establishes the materiality of any misrepresentations involving heart conditions, there is no evidence that Plaintiff's statement denying any indication of a heart disorder within the last five years amounted to a misrepresentation.

Defendant Manzo's deposition provides some insight into why he seized upon Plaintiff's episodes of shortness of breath to deny Plaintiff's medical claims. It is undisputed that Plaintiff had corrective surgery to his heart as an infant and also received some sort of heart-related treatment in 1987. In his deposition, Defendant Manzo testified that Plaintiff should have divulged his history

---

[6] Plaintiff also indicated on his application that he had not had any indication of asthma in the five years preceding the date of the application. Defendants, however, have not mentioned Plaintiff's statement regarding asthma, nor have Defendants shown that the possible misstatement was material.

26

of heart problems as an infant and young adult. *See* V. Manzo Dep. at 46-47 ("All I'm saying I think it's very critical when you fill out an application, any application, if you've had any kind of heart problems it should be stated."). The application, however, did not ask for a complete history of any heart-related or potentially heart-related problems. The application could have asked Plaintiff whether he had ever experienced shortness of breath or chest constriction, or whether he had ever experienced an indication of a heart disorder in his lifetime. The application, however, asked none of these questions and instead limited the inquiry to the preceding five years and only to those symptoms which Plaintiff knew were indications for a heart or circulatory disorder. In limiting the questions in this way, Defendants took the risk that Plaintiff would not be able accurately self-diagnose every health problem in the past five years when completing the application. There is no evidence that Plaintiff ever sought treatment for the shortness of breath and chest constriction, and Defendants have presented no evidence that Plaintiff thought that the episodes of shortness of breath and chest constriction were related to a heart disorder. Therefore, since there is no evidence that either (1) Plaintiff's episodes were related to a heart disorder, or (2) even if they were related, that Plaintiff was aware of the relationship when he completed the application, the Court finds that Defendant Manzo's decision to deny benefits on behalf of the Defendant Plan was arbitrary and capricious.

The Court's holding that Defendant Manzo abused his discretion in denying benefits is further bolstered by the conflict of interest present in this case. It is undisputed that Defendant Manzo is the owner of Defendant BIS. Defendant BIS administers the benefits plan, which it partially funds. The person acting on behalf of Defendant BIS was, of course, Defendant Manzo. "As administrator, [Defendant BIS] interprets the plan, deciding what expenses are covered, and as

27

issuer of the policy, it ultimately pays those expenses." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998) (quoting *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998)). Although Defendants argue that employees also contribute to the funding of the Plan, there is no evidence in the administrative record showing what percentage of the Plan is funded by employees. Furthermore, the Plan provides that Defendant BIS is "protected" from paying large medical claims by a separate reinsurance contract. (AR. 0019.) There is no indication of how large a claim or claims must be to be covered by the reinsurance contract, but its existence is strong evidence that Defendant BIS would incur costs associated with paying medical bills, at least below the amount covered by the reinsurance contract. Accordingly, "there is an actual, readily apparent conflict here, not a mere potential for one." *Killian*, 452 F.3d at 521.

Moreover, the conflict of interest in this case is clearly demonstrated by Defendant Manzo's behavior from the moment Plaintiff submitted his medical claims to the conclusion of the Court-ordered appeal review on remand. To begin, Defendant Manzo did not undertake a routine or standard investigation of Plaintiff's claims. Instead, after he received the bill for Plaintiff's heart valve replacement, he began to "smell something here . . . [t]his guy, he leaves, he goes on COBRA and two weeks later he's in the hospital." V. Manzo Dep. at 30. Defendant Manzo then hired Mr. Garavaglia, who was Defendant Manzo's former boss and the former owner of Defendant BIS, to investigate. *See id.* at 11. Defendant Manzo testified that after he started to "smell[] . . . a setup" by Plaintiff, he hired Mr. Garavaglia to investigate and "let him run with it." *Id.* at 31.

Defendant Manzo also had Mid-America review the claim, but as evidenced by Mid-America's final denial after the Court remanded the matter, Defendant Manzo rejected Mid-

28

America's determination that Plaintiff's claims should be covered under the terms of the policy.[7]
After rejecting the conclusion of what appears to be the only objective entity involved in the claim
review process, Defendant Manzo acted with hostility towards Plaintiff's requests for information
and further review of his claim.

For instance, as this Court has previously found, Defendant Manzo's initial denial letter
contained no reference to Plan provisions or appeal rights, in violation of ERISA regulations. *See
Trominski I*, at 10.  When Plaintiff requested a copy of the summary plan description, which he had
every right to do, Defendant Manzo responded that Plaintiff " was supplied a copy when he got the
insurance in the beginning[,]" but that another copy could be provided for a fee of $50.00, which
is approximately twice the maximum fee allowed under ERISA regulations. *See id.* at 13.
Defendant Manzo also testified that he denied Plaintiff's claims because the surgeries "were not
medically necessary," but he admitted that the Plan covered elective surgeries and that he had no
medical basis upon which to conclude that Plaintiff's surgeries were not necessary. *Id.* at 56-59; *see
also id.* at 58 ("We're not denying - that's part of the denial, but - Well, I'd refer to my attorney.
You've got why we denied it.").  Finally, Defendant Manzo determined without any input from
medical providers, including Plaintiff's treating physician, that Plaintiff's episodes of shortness of
breath and chest constriction were indications for a heart disorder instead of a breathing problem of
some sort.  The Court finds that this behavior "makes no sense in the absence of an improper
financial motive" and, therefore, Defendant BIS's actions as Plan Administrator "were shaped by

_____

[7] It is also worth noting that rather than submit Mid-America's actual denial to the Court,
Defendants apparently altered an earlier denial letter that did not contain reference to Mid-
America's findings and submitted the letter as if it contained Mid-America's findings on remand.

its conflict of interest." *Killian*, 152 F.3d at 522 (finding that employer/administrator's decision to stop accepting information in pre-authorization appeal based on plan language applicable to post-authorization appeal demonstrated conflict of interest was at work).  Accordingly, Defendant BIS's conflict of interest further supports the Court's finding that the denial of benefits was arbitrary and capricious.[8]

> 3.    *Whether Plaintiff's Assignments to Co-Plaintiffs Preclude him from Succeeding on his Denial of Benefits Claim*

Defendants also argue that Counts I and II of the Complaint alleging a wrongful denial of benefits on behalf of Plaintiff should be dismissed because Plaintiff assigned his rights to his medical providers, Plaintiffs U of M and HVSH.  Plaintiff Trominski does not dispute that any monetary recovery for the denial of benefits would go to Plaintiffs U of M and HVSH.  *See* Trominski Dep. at 108-109.  On January 31, 2003, Plaintiff Trominski amended the Complaint to add Count VI, which alleges claims on behalf of Plaintiffs U of M and HVSH as his assignees.  In addition, Plaintiff never responded to Defendants' argument that Counts I and II should be dismissed.  Accordingly, the Court will grant Defendants' motion for judgment on the administrative record with respect to Counts I and II insofar as the relief requested by those counts encompasses a monetary award to Plaintiff Trominski personally.  Nevertheless, given the Court's finding that Defendant BIS's denial of Plaintiff Trominski's claims was arbitrary and capricious, the Court will grant Plaintiffs' motion for judgment on the administrative record with respect to Count VI.

**B.    Plaintiff Trominski's Breach of Fiduciary Duty Claim**

---

[8] The lack of evidence tying Plaintiff's dyspnea episodes to a heart condition, or demonstrating that Plaintiff thought or knew the episodes were related to a heart condition that he had as a child and young adult, sufficiently demonstrates the arbitrary and capricious nature of the denial regardless of any conflict of interest.

Defendants argue that Plaintiff's breach of fiduciary duty claim fails because Plaintiff is simply recharacterizing his denial of benefits claim as a separate breach of fiduciary duty claim. Plaintiff Trominski responds by arguing that although he is seeking to remedy the denial of benefits, Defendant Manzo breached his fiduciary duty by leading him to believe that his medical claims would be covered. The Court finds Defendants' argument persuasive.

ERISA imposes significant standards of fiduciary responsibility upon administrators of an ERISA plan. *See* 29 U.S.C. § 1104(a)(1). A "fiduciary must give complete and accurate information in response to participants' questions . . . ." *Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 547 (6th Cir. 1999) (quoting *Drennan v. General Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992)). In addition, "a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *Krohn*, 173 F.3d at 547 (*quoting Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, n.2 (6th Cir. 2003) ("Even if [the plaintiff] could bring a breach-of-fiduciary-duty claim, we have recognized such claims only where the misrepresentation in question involves the availability or extent of plan benefits."). Nevertheless, the Sixth Circuit has held that "[b]ecause § 1132(a)(1)(B) provides a remedy for [the plaintiff's] alleged injury that allows him to bring a lawsuit to challenge the Plan Administrator's denial of benefits to which he believes he is entitled, he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)." *Wilkins v. Baptist Healthcare System Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). Furthermore, only equitable remedies are available for breach of fiduciary duty. *See Marks*, 342 F.3d at 454 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (holding that the

31

only relief available under § 1132(a)(3)(B) is that "typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages).")

Plaintiff's breach of fiduciary duty claim should be dismissed for two reasons.  First, Plaintiff is clearly seeking to remedy the denial of benefits through his breach of fiduciary duty claim.  *See* First Amended Compl. at ¶ 49 ("If the Plan's *denial of the claim* stands, this *constitutes* a breach of Manzo's and/or BIS's fiduciary duty.") (emphasis added).  Second, Plaintiff is seeking legal relief, not equitable relief.  In his First Amended Complaint, Plaintiff specifically asked the Court to remedy the alleged breach of fiduciary duty with a monetary award.  *See* First Amended Compl. at Count IV (requesting "an amount equal to his claims," and "interest on the amount of the judgment.").  Accordingly, because Plaintiff is seeking a monetary award by repackaging his denial of benefits claim as a breach of fiduciary duty claim, the Court finds that Defendants are entitled to judgment on the administrative record with respect to Count IV.

## C.  Attorneys Fees

Plaintiff also argues that an award of attorney fees is appropriate in this case.  Under ERISA § 502(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of the action to either party."  *See* 29 U.S.C. § 1132(g)(1).  A decision to award attorney fees is based on the following factors:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*McMurty v. Paul Revere Life Ins. Co.*, 2000 WL 799342, *6 (6th Cir. June 12, 2000) (quoting

*Secretary of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985)).

When the Court remanded this matter for a full and fair review of Plaintiff's claims, it declined to address Plaintiff Trominski's request for attorneys fees. The Court specifically noted that "Plaintiffs' attorney has not offered *evidence* of the hours reasonably spent working on Plaintiffs' case. Such *evidence* is required for an award of attorney fees under 29 U.S.C. § 1132(g)(1)." *Trominski I*, at 16 (emphasis added) (quoting *McMurty,* 2000 WL 799342, *7 ("This circuit requires a district court to apply the 'lodestar' method in calculating the appropriate fee award.")). In Plaintiff's post-remand motion for judgment on the administrative record, Plaintiff asserts that his attorney spent 102 hours on this matter at an hourly rate of $200.00 per hour. He also asserts that his attorney's associate spent 43.5 hours on this matter at an hourly rate of $150.00 per hour. He does not, however, provide any evidence, such as billing sheets, to demonstrate the manner in which the hours were spent. Plaintiff's counsel also failed to supply an affidavit, though Plaintiff's motion indicates that an affidavit would be filed within one week. Defendants also point out that Plaintiff failed to address the five *King* factors quoted above.

The "lodestar" is the "'number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995)(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). A reasonable hourly rate is determined by looking to the "prevailing market rate in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). With respect to the number of hours expended, the party requesting attorney fees "has the burden of providing for the court's perusal a particularized billing record." *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991). In other words, the moving party must provide "'evidence supporting the hours worked and rates claimed.'"

33

*Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1208 (6th Cir. 1992) (quoting *Hensley*, 461 U.S. at 433)).  While there is a strong presumption that the lodestar figure represents a reasonable fee, it does not end the inquiry.  *See Bldg. Serv. Local 47 Cleaning Contractors Pension Plan*, 46 F.3d at1401  (citations omitted).  "'There remain other considerations that may lead the district court to adjust the fee upward or downward . . . .'"  *Id.* at 1402 (quoting *Hensley*, 461 U.S. at 434).

Despite this Court's previous Opinion and Order in *Trominski I*, which set forth both the relevant factors to be discussed in determining attorneys' fees under ERISA and the requirement that Plaintiffs submit evidence of the hours expended and rates claimed, Plaintiff has failed to address any of the relevant factors or provide any evidence of the hours claimed.  Ordinarily, the Court would simply deny the fee request.  However, Plaintiff's counsel agreed to handle Plaintiff's case based on a 1/3 contingency fee arrangement.  Thus, if Plaintiff is not awarded attorney fees, one third of the amount that would otherwise go toward paying off his medical bills will instead go to Plaintiff's attorney.  While Plaintiff may or may not be entitled to attorneys' fees under the factors set forth in *King*, denying attorneys' fees altogether based on Plaintiff's counsel's failure to comply the modest requirement of providing the court with an affidavit and billing records would not further the interests of justice.  Accordingly, the Court will allow Plaintiff one final opportunity to supply the Court with enough evidence to make a reasoned "lodestar" estimate.[9]  The Court will also allow Plaintiff to address the five factors set forth in *King*.  Plaintiff must supply the required information within 15 days of receiving this Opinion and Order.

---

[9] This would presumably include both an affidavit, billing records, and information regarding the prevailing rate for similarly situated attorneys in this particular market.

## V.  CONCLUSION

Accordingly, for the reasons set forth above, Plaintiffs' Motion to Overturn Administrative Decision [dkt # 28] is hereby GRANTED IN PART; Plaintiffs' motion is granted with respect to Count VI (Claim for Benefits on Behalf of U of M and HVSH) only.  Defendants' Motion for Judgment on the Administrative Record [dkt # 27] is hereby GRANTED IN PART; Defendants' motion is granted with respect to Count 1 (Claim for Benefits) and Count II (Violation of COBRA) to the extent both counts contemplate a monetary award to Plaintiff Trominski personally, and Count V (Breach of Fiduciary Duty) only.  The remaining counts were resolved in this Court's previous Opinion and Order dated December 5, 2003.  In addition, Plaintiffs are hereby ORDERED to submit evidence, if any, in support of their request for attorneys' fees within 15 days of service of this Opinion and Order.  Defendants may respond and Plaintiffs may reply within the time periods set forth in the Court's local rules.  *See* E.D. Mich. LR 7.1.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff_____
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE


Dated:  June 24, 2005

35

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on June 24, 2005.


s/Marie E. Verlinde

Case Manager

(810) 984-3290